Abraham J. Gellinoff, J.
This proceeding and the companion proceeding in Feinstein v. City of New York are brought pursuant to article 78 of .the CPLR ¡against the City of New York, its Mayor, and other named city officials. The petitioners in the respective proceedings are Local 832, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a local labor union, suing by its president, and several of its members who are employed by the city in non-supervisory clerical titles; and Local 237, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a local labor union, ¡suing by its president, and several of its members who are employed by the city as hospital “aides”. Each proceeding is brought on behalf of the petitioners and all other city employees similarly situated.
*345 The controversy concerns the practice of ‘£ checkoff ’ ’, whereby the amount of an employee’s union dues is deducted from his wages by his employer, pursuant to his written authorization, and transmitted by the employer to the union. Such a practice for the checkoff of the union dues of city employees was first authorized by the city through a resolution adopted by the Board of Estimate in 1956. That resolution provided that any union or other organization of city employees could avail itself of the privilege of checkoff by filing written authorizations therefor, signed by the particular employees, which were to be at all times subject to revocation by such employees; but it was specifically prescribed that such privilege was to be made ‘£ available to all unions, without discrimination ’ ’. At the time of the adoption of that resolution, the city did not extend recognition to any union or other employee organization for purposes of collective bargaining, and permitted qualified employee organizations to represent their members only for the limited purpose of conferring with a city department head concerning grievances and working conditions.
In 1958 the city adopted a new Employee Relations Program under which collective bargaining on behalf of all the employees in an appropriate bargaining unit was thereafter to be conducted solely by the employee organization chosen for that purpose by a majority of the employees in such unit. No change was made, however, in the provisions of the 1956 resolution extending the privilege of checkoff to all unions alike, without regard to whether they represented a majority or a minority of the employees in the particular bargaining unit.
In April, 1967 the Mayor promulgated a new executive order on the subject of bargaining between the city and labor unions, to take effect June 1,1967. This new order, among other things, differentiates between ££ City-wide majority representative” and “ Departmental majority representative ”, between ££ Citywide bargaining unit ” and ££ Departmental bargaining unit ”. In addition, and as part of his plan to improve the city’s employee relations program -and collective bargaining process, the Mayor is about to issue a further executive -order dealing with the “ checkoff ”.
Under the contemplated executive order, every employee organization which is freely chosen as the exclusive bargaining representative by the majority -of the employees in a city-wide bargaining unit will be afforded the privilege of dues checkoff. This will not be a matter of contract but will be made available upon the designation or certification of such status. Dues checkoff privileges of all other organizations in any such city-wide *346 bargaining unit will be discontinued during the period of such city-wide majority representation status.
In the absence of city-wide majority representation for a particular bargaining unit, the freely chosen 'departmental majority representative of the employees in ¡such category will be similarly granted .the dues checkoff privilege, but only until a city-wide majority representative is chosen. The privilege will be withheld from every other organization in the departmental bargaining unit during such departmental majority representative status.
In the absence of both city-wide and departmental majority status in a bargaining unit, every qualified employee organization having members in ¡such unit will have the privilege of such dues checkoff, but only until a city-wide or departmental majority representative is chosen for the unit.
In no event would dues be deducted from .an employee’s salary except upon his written authorization for such deduction; and such authorization may be revoked at any time.
The Mayor has entered into collective bargaining agreements providing for such exclusive checkoff arrangements with District Council 37, the city-wide majority representative of city employees holding positions in the nonsupervisory clerical titles, and with Local 420, the city-wide majority representative of certain classes of hospital “ aides ” employed by the city; and has committed himself to promulgate the above-described executive order in order .to implement the exclusive checkoff provisions in such agreements. District Council 37 and Local 420' are both affiliates of the American Federation of State, County and Municipal Employees, AFL-CIO.
The petitioning local unions, which respectively represent a minority of the employees in such classifications on a city-wide basis, seek to restrain the city 'officials from effectuating this new exclusive checkoff policy. They demand judgment that respondents must continue to1 checkoff dues to petitioners, and judgment that respondents are without authority to grant exclusive dues checkoff privileges to District Council 37 or Local 420 or any ether labor organization. The validity of the collective bargaining agreements, to the effect that the Mayor will promulgate the pending implementing executive order, is thus in issue. These collective bargaining agreements constitute a “ final determination ” subject to review under article 78 of the CPLR (Matter of Lipsett v. Gillette, 12 N Y 2d 162,166 [1962]). The instant proceedings were commenced before the Mayor’s pending executive order could be issued, and the parties have stipulated that ‘ ‘ no steps would be taken to discontinue the *347 existing system of dues check-off pending the determination of the proceedings by Special Term ’ ’.
Petitioners challenge the contemplated executive order for exclusive checkoff as beyond the purview of the Mayor’s executive authority, as inconsistent with controlling statutory provisions, as contrary to the civil service provisions of the State Constitution, and as violative of the Federal and State constitutional guarantees of due process and equal protection. There is no merit in petitioners’ contentions.
The original checkoff resolution, in 1956, was adopted by the Board of Estimate in the exercise of the residual power vested in it by the 1938 City Charter; such residual power encompassed ‘ ‘ all the powers vested in the city, except as otherwise provided by law” (New York City Charter [1938], former § 70; see Matter of Moriarity v. Kennedy, 20 Misc 2d 593, 596-597). Under the present City Charter this residual power is vested in the Mayor (New York City Charter [1963], § 8, subd. a; § 1142). The Mayor is thus vested with the broad general powers conferred upon the city by statute: to enter into contracts, to regulate the selection, terms of employment and compensation of city employees and to determine the manner of transacting the city’s business and affairs (see General City Law, § 20, subds. 1, 17, 19 ; § 23, subd. 1). The Charter also specifically empowers the Mayor to supervise city offices and departments, to fix salaries, to administer budget appropriations, to adopt wage plans and to prescribe rules governing working conditions (see New York City Charter [1963], §§ 123,124, 813, subd. i). It is therefore clear that the Mayor’s power to prescribe the conditions of a checkoff is squarely within the ambit of the broad powers conferred upon him by the charter.
There is no substance to petitioners ’ contention that the regulation of checkoff is a legislative function beyond the purview of the Mayor’s executive powers. The Board of Estimate’s original 1956 resolution authorizing checkoff of union dues of city employees was a valid exercise of the residual power then vested in it by the 1938 Charter and did not require legislative implementation (cf. Matter of Moriarity v. Kennedy, 20 Misc 2d 593, 596-597). Such residual power, being now vested in the Mayor, likewise does not require legislative implementation.
Of course, the exercise by the Mayor of any power which he does possess is necessarily conditioned on its not being inconsistent with any applicable State enactment (Wholesale Laundry Bd. of Trade v. City of New York, 17 A D 2d 327; 12 N Y 2d 998). Petitioners therefore also urge that the intended exclusive checkoff executive order is squarely in conflict with subdivision *348 1 ,of section 93-b of General Municipal Law. That section, which was first enacted in 1958, two years after the adoption by the Board of Estimate of the original checkoff resolution, provides, in pertinent part, that ‘ ‘ the fiscal or disbursing officer of every municipal corporation * * * is hereby authorised, to deduct from the wage or salary of any employee of such municipal corporation * * * such amount that such employee may specify in writing filed with such fiscal or disbursing officer for the ,payment of dues in a duly organized association or organization of civil service employees and to transmit the sum so deducted to the said association or organization ”. It further provides that ‘ ‘ any such written authorization may be withdrawn by such employee or member at any time by filing written notice of such withdrawal with the fiscal or disbursing officer” (italics by court). Petitioners’ contention, in essence, seems to be that the Legislature, by virtue of section 93-b, pre-empted the subject matter of checkoff of municipal employees’ union dues, that such checkoffs may now be made only as authorized by . section 93-b, and that the clear implication of the statute is that any municipality adopting the practice of checkoff must make it available on a nondisoriminatory basis to “ any employee ” who files a written authorization therefor as therein provided.
It is clear, however, as noted, that the city’s power to adopt and regulate the practice of checkoff does not rest on section 93-b, being encompassed instead in the grant to municipalities of general powers for the regulation of their internal affairs, previously made by the Legislature (General City Law, § 20). Moreover, there is no indication in section 93-b of any purpose to occupy or preempt the entire field of checkoff (cf. McMillen v. Browne, 14 N Y 2d 326, 333). The section is thus of a purely permissive nature and does not confer any right on any employee to require compliance with his request for the checkoff of his union dues (Matter of McLaughlin v. Niagara Falls Bd. of Educ., 38 Misc 2d 143). Its effect is merely to require that, if a municipality does decide to exercise its power to make payroll deductions on account of the union dues of any of its employees, it must adhere to .the limitations specified in the section (cf. Matter of Devita v. Scher, 52 Misc 2d 138). The only limitations mentioned in the section are that there must be on file with the fiscal or disbursing officer a written authorization by the employee for such a deduction, that the deduction be “ for the payment of dues in a duly organized association or organization of civil service employees ”, and that such authorization be subject to withdrawal by the employee at any time. There is no require- *349 meat in the section that every employee be granted the right to have such a deduction made at his request.
It has been declared, that where, as the court finds is the case here, the State has not occupied or pre-empted an entire field, a municipality which is empowered to act in that field may, in spite of general regulations by the State, adopt additional regulations or requirements not inconsistent with the State enactment, where warranted by special local conditions (see Matter of Kress & Co. v. Department of Health of City of N. Y., 283 N. Y. 55, 59). There would thus be nothing to prevent a municipality from attaching additional conditions to the availability of checkoff beyond those specified in section 93-b, as, for example, that the particular employee 'Organization be one that meets certain reasonable standards. Here the city has imposed the further condition that the dues to be deducted be for membership in the employee organization that has been duly selected as the majority representative for all the employees in the applicable bargaining unit. The imposition of that condition contravenes neither the letter nor the intent of section 93-b.
It may be noted, in passing, that the recently enacted Public Employees’ Pair Employment Act, effective September 1, 1967, and not here applicable, gives majority unions of public employees the right to have their members’ checkoff requests honored; but the statute is silent concerning the right to checkoff on behalf of minority unions (Civil Service Law, § 208, as added by L. 1967, ch. 392).
Petitioners’ further contention that the challenged exclusive checkoff procedure is in conflict with the constitutional and statutory provisions governing appointments, tenure and promotions in civil service (N. Y. Const., art. Y, § 6; Civil Service Law, §§ 61, 95, 115), is not persuasive. In point of fact, the practice of checkoff, whether on an exclusive or a nonexclusive basis, can in no way operate to affect or prejudice the employee’s civil service rights. No deduction may be made from the employee’s salary or wages under the city’s intended checkoff program unless the employee himself consents thereto, and he remains free to revoke such consent at any time, without in any way affecting his tenure.
Finally, it remains to be considered whether the intended executive order runs afoul of the constitutional guarantees of due process and equal protection (U. S. Const., 14th Arndt.; N. Y. Const., art. I, §§ 6, 11). The requirements of due process are satisfied so long as the challenged measure is reasonably related to the attainment of a permissible objective (Railway *350 Employes’ Dept. v. Hanson, 351 U. S. 225, 233-235; Virginian Ry. v. Federation, 300 U. S. 515, 558-559; Labor Bd. v. Jones & Laughlin, 301 U. S. 1, 43-45). Similarly, the equal protection clause requires no more than that a classification made have “ some reasonable basis ” (Morey v. Doud, 354 U. S. 457, 463-464; Bucho Holding Co. v. State Rent Comm., 11 N Y 2d 469, 477), and that “ a distinction made have some relevance to the purpose for which the classification is made ” (Baxstrom v. Herold, 383 U. S. 107, 111). The courts may not strike down governmental measures merely ‘ ‘ because they may be unwise, improvident, or out of harmony with a particular school of thought ” (Williamson v. Lee Optical Co., 348 U. S. 483, 488).
We are here dealing with the highly sensitive area of employer-employee relations affecting the city’s huge working force of over 250,000 employees. Present experience attests to the untold havoc that can follow in the wake of the disruption of vital city services consequent upon employee work stoppages and to the crucial importance of adopting suitable programs for the maintenance of stable and equitable relations between the city and its employees. To that end, the city’s employee relations program has since 1958 embodied the policy of according exclusive recognition for purposes of collective bargaining to the duly selected majority employee representatives in designated appropriate bargaining units. That practice is of undoubted validity (cf. Matter of Kleinman v. McCoy, 19 N Y 2d 292; Civil Serv. Forum v. New York City Tr. Auth., 4 A D 2d 117, 128, affd. 4 N Y 2d 866).
The city has now determined that the attainment of the high objectives of its employee relations program demands that the employee organization duly chosen by a majority of the employees in a designated bargaining unit to serve as the exclusive representative of all of the employees in such unit far purposes of bargaining and grievance procedure, should also be accorded the exclusive privilege of checkoff, so long as it maintains its majority representative status. The 'Stated purpose is to strengthen the role of the selected organization as majority representative. Any employee remains free to refuse to sign a checkoff authorization, or to revoke a previously executed authorization, and he may continue his membership in a minority employee organization or choose not to belong to any union.
As the Appellate Division has aptly declared in an analogous situation (Matter of Patrolmen’s Benevolent Assn. v. Wagner, 8 A D 2d 369, 373, affd. 7 N Y 2d 813, cert. den. 363 U. S. 810) : “ It is not for the courts to establish or evaluate administrative *351 policies pertaining to the relation between the City of New York and its employees. We may only adjudicate the power of the respondents [City officials] and the extent thereof in the promulgation of such policies. The courts may intrude only to a very limited extent upon the policy-making powers of the respondent Mayor of the City of New York which involve complex, difficult and controversial matters in a very sensitive area of employer-employee relations between the city and its thousands of employees.”
There appears to be ample precedent for the new exclusive checkoff policy here under attack. A similar policy has been adopted by Congress in the Railway Labor Act (TJ. S. Code, tit. 45, § 152, rsubd. Eleventh, pars, [b], [c]). It is there specifically provided that dues deduction agreements affecting railway employees subject to that act may be entered into only between the carrier and the labor organization which represents a majority of the employees in the particular craft or class, and for the exclusive benefit of that labor organization. Those provisions have been consistently enforced by the Federal courts, without any suggestion of doubt as to their validity (e.g., Switchmen’s Union of North America v. Southern Pacific Co., 253 F. 2d 81, 84 [9th Cir.], cert. den. 358 U. S. 818; Brotherhood of Locomotive Firemen & Enginemen v. Northern Pacific Ry. Co., 274 F. 2d 641 [8th Cir.]).
A similar policy prevails in the Federal civil service, under which a governmental department is permitted to enter into a dues checkoff agreement, affecting the employees in a particular bargaining unit, only with the employee organization representing a majority of the employees in that unit, where such a majority representative has been duly selected (see Code of Fed. Reg., tit. 5, § 550.304, subd. [a], par. [5]; Executive Order 10988, § 5, January 17, 1962, 27 Fed. Register, p. 551).
The practice of according the privilege of exclusive checkoff to majority employee representatives is also followed by the New York City Housing Authority and the New York City Transit Authority. Indeed, it appears that one of the petitioner unions, Local 237, itself has an exclusive checkoff arrangement with the New York City Housing Authority embracing Authority employees in various bargaining units for which that union is the majority representative.
It is unnecessary to determine whether, and to what extent, if any, similar practices prevail in the area of labor management relations in private industry — a matter on which the parties are in dispute. There is no doubt, however, that the checkoff [s a widely practiced ‘1 means of implementing union security ’ ’ *352 (see Industrial Union of Marine & Shipbuilding Workers v. N.L.R.B., 320 F. 2d 615, 619 [3rd Cir.]) and is a proper subject for collective bargaining under the National Labor Relations Act and for inclusion in a union-management contract (see National Labor Relations Bd. v. Reed & Prince Mfg. Co., 205 F. 2d 131, 136 [1st Cir.]; Porter Co., 153 N. L. R. B. No. 119, 59 LRRM 1462). One early decision has interpreted the National Labor Relations Act as precluding a majority union from obtaining the special advantage of exclusive checkoff arrangements as against a rival, minority union (see Hughes Tool Co. v. National Labor Relations Bd., 147 F. 2d 69, 74 [5th Cir.]). We need not, however, consider whether that case accurately reflects the current state of the Federal law, .since we are not here concerned with the Federal act or its proper interpretation. The question before this court is not one of interpretation of the challenged measures, but of their constitutionality; and no such issue was either considered or decided in Hughes Tool Co. v. National Labor Relations Board (supra).
Actually, majority unions have available to them, under the National Labor Relations Act, union security devices far more extreme than those involving exclusive checkoff. Thus, a majority union may enter into an agreement with an employer providing for a union shop, under which all the employees in the particular bargaining unit, including those who belong to a rival union, must within a specified period of time “ join and maintain membership in the union designated as the bargaining representative or suffer discharge ’ ’ (see Pennsylvania R.R. Co. v. Rychlik, 352 U. S. 480, 493). The United States Supreme Court has squarely upheld the validity of the Congressional legislation sanctioning such, agreements for a union shop (Railway Employees’ Dept. v. Hanson, 351 U. S. 225, 233, 235, supra; see Radio Officers v. N.L.R.B., 347 U. S. 17, 40-41; cf. Colgate Co. v. Labor Bd., 338 U. S 355, sustaining the earlier Federal legislation which permitted .agreements for a closed shop).
There is all the more reason for applying the rationale of those decisions to more moderate union security measures such as those at bar, under which .the special advantage given to the majority union consists not as under the union shop, of the right to demand and receive dues from employees who would prefer to be nonunion or to belong to a different union, but merely of facilitating the collection of dues from .those who have freely joined .the union of their choice. Whether such measures are wise or provident or best calculated to achieve the objective of stable and equitable employer-employee relations, is not the concern of the courts (see Williamson v. Lee Optical Co., 348 *353 U. S. 483, 488, supra; Matter of Patrolmen’s Benevolent Assn. v. Wagner, 8 A D 2d 369, 373, supra). “ The task of the judiciary ends once it appears that the * * * measure adopted is relevant or appropriate ’ ’ to the attainment of a permissible goal (cf. Railway Employees’ Dept. v. Hanson, 351 TJ. S. 225, 234, supra). This court cannot say that the measures here in question do not meet that test or that they do not satisfy the requirements of due process and equal protection (cf. Civil Serv. Forum v. New York City Tr. Auth., 4 A D 2d 117, 128, supra).
No question as to the validity of exclusive checkoff appears to have been decided in Matter of Lipsett v. Gillette (12 N Y 2d 162), on which both petitioners and the city rely. Petitioners also cite Mug ford v. City of Baltimore (185 Md. 266) where it was held that the City of Baltimore lacked the power either to grant the privilege of exclusive checkoff to a majority union of municipal employees or even to recognize that union as the exclusive representative of the employees in the particular bargaining unit for purposes of collective bargaining. The rationale of that decision is plainly at odds with the approach taken by the courts of this State (cf., e.g., Matter of Kleinman v. McCoy, 19 N Y 2d 292, supra; Civil Serv. Forum v. New York City Tr. Auth., supra).
The court arrives at the conclusion that the exclusive checkoff provisions of the two collective bargaining agreements involved herein are valid; and that the exclusive checkoff provisions in the intended executive order in implementation of the exclusive checkoff provisions of the agreements are valid. Accordingly, the relief prayed for in each of the petitions is, in all respects, denied and the proceedings are dismissed.